Mr. Patel was a student at Texas Tech with an undiagnosed learning disabilities who had to study and learn differently than most students without those types of disabilities. As a result of these disabilities, he developed a unique technique of repeatedly re-reading materials to the point of memorization. Both of the appellants retained experts explaining to Pine that Patel's actions in this case were not cheating and were not plagiarism. Did he urge that disability to the panel that considered this case? No, he actually was not even aware of this disability at that time. He knew that he learned in a different way, but he had never been diagnosed until Dr. Coyle, who was our psychologist in this case, did the testing. He had never had a diagnostic testing performed in the past where it was actually discovered in the course of this litigation that he has the reading comprehension ability of a sixth grader. Those are powerful or interesting facts, but how would they go to whether Texas Tech gave him appropriate process if he hadn't even discovered that at the time? Our inquiry is whether they acted beyond professional norms. What we're talking about here is we have an exam that is red flagged by a professor who says these answers look similar to some of the answers in study materials and other materials available online. There was never any allegation that someone saw him cheating, that someone saw him access unauthorized material. When asked by the university how is it that you were able to provide these types of answers verbatim compared to study materials, his response was that he read these things over and over and over again and he memorized them. The university simply chose to say, no, we don't believe that. That can't possibly be true here. No one can memorize that amount of material, so therefore it must be cheating and it must be plagiarism. What we have provided to the district court was two experts that not only verified that that was true, that what Mr. Patel was telling the school was actually accurate, but when it comes to the report of Dr. Coyle, he provides us with an explanation as to why Mr. Patel studies in the way that he does. I guess my question again is that is an interesting offer, but whatever the district court did with those experts, it doesn't affect whether he was given appropriate process or rather beyond the pale non-appropriate process by Texas Tech, and isn't that the sole inquiry we're focused on? The inquiry that we're focused on here is a substantive due process issue, whether or not the university's actions were rationally related to the response of dismissing him from a master's. Is that really the standard? Is that really the standard for this kind of substantive due process claim, mere rational relation? Don't we have to find that the university has departed from academic norms completely? Well, not in this case, because we're not talking about an academic issue here. We're talking about a disciplinary issue. Don't so, okay. Did you make a procedural due process claim, or was it just substantive due process? No, it's just a substantive due process claim. Am I correct, having looked at this, there's no circuit that has ever overturned, circuit that's ever overturned an academic decision like this? Well, again, we're not alleging that this was an academic — A disciplinary decision. This was a disciplinary type of decision. Has any circuit ever overturned a disciplinary decision like this? Yes. In fact, we — Which one? Well, when it comes to the issue of substantive due process, this Court has ruled on the issue of how it applies to a university. And we cite to that case in our briefs, which is the Mills v. Garcia case, which held that there has to be a — That's a public employment tenure decision case, correct? It is. But it applied the arbitrary and capricious rule to a university the same as we would — Well, that's true. And Ewing and what's our leading authority? Is it Wheeler? Right. Arbitrary and capricious. Right. Real departure from norms. And there, I think the President relied on facts that even the dissenter below in the panel had said were wrong. So at the — at the school level, there was a real miscarriage and breakdown. Is that a fair description of the holding? Yes. Yes. But here, you haven't, to my knowledge, haven't pointed to a breakdown and a refusal to hear the student or the refusal to hear, I mean, his contention. Right. And this — and again, it's not a procedural due process issue. We're not alleging that he didn't have a hearing and that he didn't — that there wasn't a process in place that wasn't adhered to. What we're alleging here is that the allegations of — and a finding of misconduct don't fit the — don't fit the facts here. It's just a — it's not a rational conclusion. But why isn't — why isn't comparing the answers given on an exam to material that's available online that shouldn't be accessed, why isn't comparing that language to discern whether someone is, in fact, doing something they shouldn't be doing, why isn't that a perfectly reasonable way for a university to go about doing this, or better yet, a perfectly reasonable basis on which to do that? Because that material was not — necessarily not available. It was not — the — there has not been any showing that Mr. Patel accessed any information that he was not allowed to access. What they're alleging is that he accessed this information during the course of the exam. What Mr. Patel is saying is that he reviewed all the material, the case notes provided by the professor, and a lot of these terms and terminologies were in these materials that he was reviewing. And there was nothing wrong with him reviewing that. It wasn't against a policy or a rule for him to use the materials that he was using to study. What they're alleging is that he somehow accessed this information during a closed-book exam when he shouldn't have accessed it, when there is absolutely no proof whatsoever that he did that. I'm just curious factually, these online exams, they were with the whole class proctored, or each person can take the exam at home? That's an important point. This exam was proctored by the professor himself in a small conference room with nine to ten students, and Mr. Patel was sitting four feet away from the proctor during this entire exam. And does the record reflect — were the laptops not disabled? Oh, and they had to go on the internet. I don't know if they had to go on the internet or not, but they did take these exams on laptops. There was a number — well, there was a confusing issue at the time because the professor allowed one class to take the exam open book, open note, and he didn't allow the others to take it open book, open note. Nonetheless, my client took it as a closed-book exam, adhered to those rules. Now, an important thing here, and the first issue that we raise in our briefs is the issue of the district court not considering the expert reports in his ruling on the motion for summary judgment. And the judge made a clear error on that. Let me ask you about that. Suppose we agree with you. Can we then consider those expert reports in our review of the summary judgment ruling and see if — even if we include them, there — you know, can we assess whether there's a material — a genuine issue, material fact? I believe the court can do that if they choose to do so. We certainly believe that the court — that that error by the district court of misapplying Rule 56 to an expert report is enough for this court to vacate his decision and — Well, that was my question. My question was if we find the error in the Rule 56 error on the reports, can we nonetheless say, okay, let's look at the reports along with all of the other evidence and see is there a genuine issue, material fact, and then go ahead and review the summary judgment ruling? Yes, you can. Okay. In getting to the report of Dr. Coyle, Dr. Coyle, as I said, was the first one who diagnosed this severe learning, reading comprehension disability and opined in his report and determined that he used these compensatory learning strategies, such as rereading the text materials over and over, long study hours, and memorization of facts. The bottom line is Mr. Patel has been successful in school based on hard work and a determination to push through and to be a good student. So as I understand your theory, because of this learning disability, Mr. Patel's strategy for preparing for exams involves memorizing large chunks of the text. Yes. Right. And so how does that account for, as I recall, there was a suspicious part of his exam where he used a term that was not in the text. Bubbly, yes. Yeah. How does that fit with this theory? Mr. Patel alleges that that is a term that was used in certain test materials, perhaps a term used in class. It was a term that he had in his notes. Where the exact source of that term came from, he's not sure. But as we discussed in our briefing, even the professor had memorized these exam questions and would use them as examples in class. And Mr. Patel believed that that was a term that he used in class that he simply regurgitated off out of memory when it came time. The term didn't also show up on the internet in a test bank answer? I'm sorry, your honor? Did that term also show up in the internet on a, in a test bank answer or something like that? It does, yes. It does. It is provided all over the internet. It's in multiple forums. It's, you know, the bottom line here. So why couldn't a university say, well, that's suspicious? That's evidence of inappropriate activity on the exam? Because Mr. Patel took this exam four feet away from the proctor, was not observed doing anything unusual. He completed the exam in the same amount of time as the other students. And what Dr. Perlman says in his report that it's his opinion that if Patel was copying and pasting this material, he wouldn't have had time to adequately do that and complete the exam at the same time as the other students. With that, your honor, I will reserve the remainder of my time. All right. Thank you, counsel. Is it Ms. Dabble? May it please the court. Your honors, it's apparent that the appellant is trying to use this lawsuit as a collateral attack on the decisions that were made by faculty at the university. Under the narrow and restrained standards set forth by the Supreme Court in Regents of the University of Michigan v. Ewing, which is 474 U.S. 214, and its progeny, this court must uphold the district court's final order in judgment dismissing appellant's substantive due process and equal protection claims against the appellees. The uncontested summary judgment evidence that was submitted by the appellees conclusively negates any issues of material fact as to whether the appellees exercised professional judgment and adhered to accepted academic norms. So that's what we're looking at, essentially.  That's correct, your honor. Under Ewing, what we're looking at is did they, did the university adhere to accepted professional norms in determining whether there was an infraction, whether there was cheating? That is correct, your honor. And counsel for the first time here on appeal just raised the issue of whether this was an academic or disciplinary hearing. It doesn't matter if it was academic or disciplinary. It doesn't matter under our law or all circuit law? Under our law. Because other circuits, other secret circuits seem to be developing that distinction. I believe so, but it seems established in this circuit under FAM v. Blaylock, which is 712 Federal Appendix 360, that to establish a constitutional violation in the disciplinary dismissal context, there must be evidence of conduct that is so egregious as to shock the conscience. Here, there is no evidence of that. Similarly... If they'd refused to consider Dr. Coyle, if the panel had refused that, would that begin to approach more our Mills decision? If his entire defense had been his disability and the panel had said, you know, for whatever reason, we won't listen to them. You know, your honor, that's, that has never been before the panel. It's not at issue in this case. The reports are certainly not at issue in this case. Okay. Let me just ask you broadly to distinguish Mills, then. Okay. With respect to Mills, as you pointed out, that wasn't in an academic context. It didn't have to do with a student or... True. But the test sort of reduces to the same one. Did they act in an arbitrary and capricious way? I think I'm right that the test is roughly similar. It is roughly similar, Your Honor. Okay. So if it's the same test, why, why would we have reversed there and not here? Here, what we have is, I think I'm misunderstanding your question, Your Honor. With respect to the standards here, substantive due process, equal protection, we, the, this is, we're not looking at procedural due process and there is no legal precedent here that has established that there are different standards with respect to academic or disciplinary. I think Judge Higginson is just asking to distinguish what happened in Mills. I'm... Is it a reason for us to reverse here? I don't mean to... Yeah, no, that is the question. I don't believe that there is any reason for us to reverse here. There is an abundance of evidence showing that there is nothing that is remotely close to conduct by the appellees that shocks the conscience or is beyond the pale of reasoned academic decision making. If anything, all of the evidence in the record shows that at all relevant times, each of the appellees, Appellee Dwayne Jones, Brittany Todd, the investigator, the panel members, and Dr. Jeff Mercer, who handled the appeal, all adhered to accepted academic norms with respect to their conduct when they were handling appellant's case. There has been no evidence in the record submitted that shows that they ever strayed from accepted academic norms. And in fact, the evidence shows that they were very much following Texas Tech University policies and procedures with respect to each of their actions. I guess, what's the underlying infraction? Was he plagiarizing or was he... He cheated and plagiarized and he was found to have used prohibited materials on his final exam. But let's just assume he had seen the bubbly answer online before. He was allowed to look at... He was certainly allowed to look at Google before. Okay, assuming that is so, the appellant himself testified on the witness stand during the preliminary injunction hearing that his review of any test bank answers prior to the final exam would be considered cheating. And his use of any answers from a test bank... I'm just curious. Why would that be cheating? Considered cheating and plagiarism. Why would it cheat to get ready for an exam to just look online where they weren't allowed? They were test banks. So test banks give you the answers to final exams. You shouldn't be studying answers to final exams from test banks when you're prohibited from using outside material. Oh, they're prohibited from referring to outside material all course long? All course long. So the appellant also admitted on the stand that prior to the beginning of the course, he was provided with a syllabus by the professor, Dwayne Jones, which indicated that he was prohibited from using any outside materials on the final exam. Well, but that's a slight important distinction. I'm just a little confused. You say on the final exam, yes, you can't look at Google while you're typing out your answers to get an answer. But are you telling me that the syllabus said you can never look at Google all semester long? The syllabus didn't say that specifically, Your Honor. But let's think about what's considered to be cheating. If you're studying from a test bank for the test that you're about to take, and you're looking at a test that you're about to take into your final exam, that would be offensive. It may not be relevant to this issue, but I guess maybe then I would have thought you could look at anything on Google to try to understand. If you get lucky and find that the test, the teacher actually has borrowed the exact question and answer that's on Google, sort of then shame on the teacher. Correct, Your Honor. But I want to back up a little bit more. So opposing counsel tried to indicate that there's absolutely no evidence here that he's cheated or plagiarized, and they're trying to launch a collateral attack on the decision that was made by the hearing panel and upheld by Dr. Jeff Mercer. And that's simply not the standard that we're looking at here today. But regardless, the appellant actually testified on the witness stand that there was nothing prohibiting him from accessing the internet during the final exam. There was nothing prohibiting him from accessing his personal files on his computer during the final exam, and there was nothing prohibiting him from accessing the test bank if he wanted to. And if you look at the evidence in the record, which I can point to citations to that evidence, it will show that it appears that nearly 90 percent of his essay answers are copy-pasted word for word out of test banks. So, I mean, looking at the standard and whether or not it was there's a reasoned academic decision that was made here and a rational basis for the decisions that were made. There's simply no evidence that this was anything conscious shocking. I believe that, you know, review of the comparisons in and of themselves is sufficient to meet the standard of a rational academic decision with respect to whether this individual cheated, plagiarized, and used prohibited materials. With respect to the allegation that he was in a conference room and the proctor was four feet away and nobody caught him on camera and nobody saw it happen, well, I mean, that may be all well and good, but there has been affidavit testimony submitted in this case by appellee Dwayne Jones who said that he was at such an angle where he could not view the appellant's computer. And he did not specifically have an eyeline to see what the appellant was doing the entire time, nor did he know the appellant at all. In any event, I don't imagine that it's accepted academic standards that the only way you can get somebody for cheating is if you catch them in the act. That's correct, Your Honor. Do you know of a circuit case that is reversed? May I ask a question, please? Why is it that all the students couldn't do exactly what he did? There's nothing saying that they couldn't do exactly what he did. Nobody was prevented from accessing the internet during their final exams, but it was very much on the conscience of the student not to be cheating and plagiarizing on their final exam or using outside materials that were prohibited. What occurred in this case and what the appellant tried to argue was that there were two student comparators who were similarly situated with him when, in fact, they weren't at all. They were accused of having used Google on their final exam by a peer. The peer never named those individuals, and she later recanted her story so that there was actually no evidence that they had cheated or plagiarized. But the appellee, Dwayne Jones, went and looked at the seating arrangement for the final exam to see where those students had been sitting, looked at their final exams, treated their final exams in the same manner that he did the appellant's. He ran it through the Turnitin comparison software, and he did not find any evidence of cheating or plagiarism or use of prohibited materials on their final exams. So at that point, he did not have the same rational basis for submitting them to the Office of Student Conduct as he had with the appellant in this case. Do you agree with me that this whole testing procedure is susceptible to exactly what happened here? I agree, Your Honor. And, you know, you would think that we could hold students to a level of, you know, conduct that they would not be accessing the tests or the Internet. And I know for sure, whenever I was in law school, we were prohibited. We had some sort of blocking mechanism on our computers that restricted our ability. I was going to say, both of you are young enough, and I just — I taught about 10 years ago. The Internet was blocked on the laptop. Right. Well, I was perplexed at the fact that there was no blocking mechanism. And I don't know if they — I've strongly advised that they do have some. I used to teach in law school, and I didn't let the students use laptops. And I think that was a better practice. Just saying. I agree. I wrote my — I wrote mine on this. I wrote my exam. I did just fine. Do you agree with counsel opposite that if we decided that the court should have considered the expert reports and made an error, that we can take those into account in reviewing the summary judgment? I do not agree with that at all. I believe that the reports are wholly outside the record. First and foremost, aside from the fact that they never even, you know, raised the issue of the court's disregard for the expert reports in the district court, which they should have and could have on a motion for reconsideration, those reports are wholly outside the record in that they in no way opine on the appellee's conduct. They in no way speak to the substantive due process or equal protection. Right. But I don't — I don't want you to misunderstand my question. Suppose we just say, look, the court should have considered them. We look — can we just take them into account in all the evidence and say, hypothetically, we still see no genuine issue of material fact? I believe that we can. It's sort of a harmless error kind of thing. I believe that they — I think it's a harmless error. If it were an error. If there is an error, which I say there wasn't, first of all, because it was waived, and second of all, because it doesn't meet the Daubert standards. So I don't think that they would come in because they're not relevant or reliable, and we raise those issues in our motions to strike. But if there was error even after that, the error is harmless because it is entirely outside the record. It has nothing to do with the standards that we have to weigh here, the substantive due process and equal protection standards of does it shock the conscience? Is it beyond the pale of reason to academic decision-making? There is nothing in those reports that even remotely speaks to that. If anything, they just offer conclusory, baseless allegations and collateral attacks on what the decision was and don't speak to anything regarding the claims at issue in this case. Okay, counsel. Thank you. Thank you. Mr. Butler. Judge Duncan, you had asked if the court could make a decision, if the court could take the expert reports into account and then say that that was essentially a harmless error. And my answer remains yes, the court can certainly do that, but one of the reasons I would ask the court not to do that in this case is considering, and the record at the district court is clear, that discovery in this case was very limited. There was a stay of discovery through a good portion of this case, and a number of depositions that we would have liked to have taken were not taken as a result of that. So that was an issue that is in the briefs, but it is clear from the district court record, you will see that discovery was limited in this case by the order of the court. Is it part of your argument that substantive due process was violated because of a limitation on discovery? Absolutely not. Okay. Your opposing counsel said that there's no evidence that this, well, that the referral, the investigation, or the deliberations were done inconsistent with Texas tech practices. Do you dispute that statement? I don't dispute that statement. And again, we're not alleging any type of a procedural due process here, that this is strictly from a due process standpoint, this is only a substantive due process issue. And, Your Honor, just, this is not, the purpose of this case is not to attack the university here. The purpose of this case is we have a student who has, is losing his dream, is losing his chosen path of a career to obtain a master's degree in order to be a CPA. Can he no longer do that? Um, with a dismissal from a Texas, from a reputable master's accounting program like Texas Tech, it is generally accepted that he, he most likely would not be accepted into a reputable similar program. He has not gone out there and is not applying, but the reality is that with a student that has been dismissed for plagiarism, he would have to reveal that so he, he, he has been harmed as a result of this. I think Your Honor. Okay. Wonderful. That's the final case for the day. So we'll stand in recess until tomorrow at 9 a.m. Thank you.